943 So.2d 919 (2006)
Richard Vincent PAEY, Appellant,
v.
STATE of Florida, Appellee.
No. 2D04-2318.
District Court of Appeal of Florida, Second District.
December 6, 2006.
*920 Eli D. Stutsman, pro hac vice, Portland, OR (withdrew after briefing); John P. Flannery, II, pro hac vice, of Campbell Miller Zimmerman, Leesburg, VA (substituted as counsel of record); and Robert W. Attridge, Jr., of Attridge, Cohen, Lucas, Jefferis, Green & Magee, New Port Richey, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and John M. Klawikofsky and Elba Caridad Martin, Assistant Attorneys General, Tampa, for Appellee.
WALLACE, Judge.
Richard Vincent Paey appeals multiple judgments and sentences entered by the trial court after a jury trial. Mr. Paey raises six issues on appeal. We affirm without discussion on five of the issues, but we write to explain why Mr. Paey's twenty-five-year mandatory minimum prison sentences are constitutionally permissible.

I. FACTS AND PROCEDURAL HISTORY
Shortly before his graduation from law school in 1985, Mr. Paey was involved in a calamitous automobile accident. As a result of the automobile accident and subsequent failed back surgeries, Mr. Paey suffers from severe and unremitting back pain. In 1990, Dr. Stephen Nurkiewicz began treating Mr. Paey in New Jersey, where the Paey family then lived. Dr. Nurkiewicz prescribed oxycodone (Percocet), hydrocodone (Lortab), and diazepam (Valium) for Mr. Paey to treat his chronic back pain. At the end of 1994, the Paey family moved to Pasco County, Florida. However, Dr. Nurkiewicz continued to act as Mr. Paey's treating physician, and Mr. Paey returned to New Jersey on several occasions for office visits. On December 26, 1996, Dr. Nurkiewicz treated Mr. Paey for the last time. During this last office visit, Dr. Nurkiewicz gave Mr. Paey a prescription for oxycodone and a prescription for hydrocodone to be used in January 1997.
In 1997, Deputy Sheriff Bobby Joe Wright of the Pasco County Sheriff's Office investigated an allegation of drug trafficking involving Mr. Paey. Deputy Wright had been contacted by a local pharmacist who was concerned that Mr. Paey was abusing prescription drugs. On February 24, 1997, Deputy Wright observed Mr. Paey fill a prescription for 100 pills of oxycodone at the pharmacy where the pharmacist who had contacted the deputy was employed. On March 5, 1997, Deputy Wright interviewed Dr. Nurkiewicz in New Jersey concerning how frequently he prescribed medications to Mr. Paey. Dr. Nurkiewicz denied issuing, writing, authorizing, or signing prescriptions for Mr. Paey after Mr. Paey's last office visit. Afterwards, Deputy Wright obtained and executed a search warrant for Mr. Paey's home. The search resulted in the seizure of the following items: miscellaneous pieces of paper cut into the size of prescription forms; blank prescription forms with Dr. Nurkiewicz's name and address at the top; three prescription bottles; and an address book containing Dr. Nurkiewicz's name, phone number, and Drug Enforcement Administration (DEA) number.
At trial, the State presented the testimony of six pharmacists from three different pharmacies. The testimony of these pharmacists established very substantial prescription activity by Mr. Paey during February and March 1997. On February 5, 1997, Mr. Paey filled a prescription for 100 pills of oxycodone, a prescription for 100 pills of hydrocodone, and a prescription for 80 pills of diazepam. On February 7, 1997, Mr. Paey filled a prescription for 100 pills of oxycodone and a prescription for 80 pills *921 of diazepam. On February 20, 1997, Mr. Paey filled a prescription for 100 pills of oxycodone and a prescription for 100 pills of hydrocodone. On February 24, 1997, Mr. Paey filled a prescription for 100 pills of oxycodone. On February 27, 1997, Mr. Paey filled a prescription for 100 pills of oxycodone, a prescription for 100 pills of hydrocodone, and a prescription for 80 pills of diazepam. On March 6, 1997, Mr. Paey filled a prescription for 100 pills of oxycodone and a prescription for 80 pills of diazepam. On March 10, 1997, Mr. Paey filled a prescription for 100 pills of oxycodone and a prescription for 100 pills of hydrocodone. To summarize, Mr. Paey filled prescriptions for 700 oxycodone pills, 400 hydrocodone pills, and 320 diazepam pills over the course of thirty-four days. Dr. Nurkiewicz, the State's key witness, testified that he did not write any of these prescriptions.
A jury found Mr. Paey guilty of seven counts of trafficking in oxycodone, four counts of possession of hydrocodone, and four counts of obtaining or attempting to obtain a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge. The trial court sentenced Mr. Paey to a twenty-five-year mandatory minimum prison sentence for each trafficking count in accordance with section 893.135(1)(c)(1)(c), Florida Statutes (Supp. 1996). For each possession count and obtaining by fraud count, the trial court sentenced Mr. Paey to imprisonment for one year and one day. The trial court designated all of the sentences to be served concurrently.
Mr. Paey argues that the mandatory minimum sentencing framework in section 893.135(1)(c)(1)(c) violates the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution and the cruel or unusual punishment clause of a former version of article I, section 17 of the Florida Constitution. We disagree. However, before we proceed to our analysis, we pause to explain how Mr. Paey could be convicted of "trafficking in illegal drugs" under section 893.135(1)(c)(1) in the absence of proof that he sold any illegal drugs. As used in section 893.135(1)(c)(1), "trafficking in illegal drugs" is a term of art.[1] Under this statute, a person need not sell anything to commit the "trafficking" offense. In addition to selling, purchasing, manufacturing, delivering, or importing a proscribed substance, a person may commit the offense by knowingly being in actual or constructive possession of an enumerated controlled substance in a quantity equal to or greater than a weight designated by statute. In Mr. Paey's case, there was no evidence that he was knowingly selling, manufacturing, or delivering oxycodone. Instead, Mr. Paey was convicted of trafficking in oxycodone because the State proved that he knowingly possessed at least four grams of oxycodone or four grams of any mixture containing oxycodone. Thus Mr. Paey's lengthy prison sentences are based on a jury verdict that he knowingly possessed at least twenty-eight grams of oxycodone or twenty-eight grams of any mixture containing oxycodone. See § 893.135(1)(c)(1)(c).

*922 II. EIGHTH AMENDMENT ANALYSIS
A. The Case Law
The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Historically, the Eighth Amendment has protected individuals with respect to the method of punishment, not the length of a period of incarceration. Hall v. State, 823 So.2d 757, 760 (Fla.2002) (citing Harmelin v. Michigan, 501 U.S. 957, 979, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)). The United States Supreme Court has not reached a consensus on the standard to be applied in assessing the constitutionality of long prison sentences. See generally Ewing v. California, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (plurality opinion) (explaining the Supreme Court's history of analyzing Eighth Amendment issues). However, in 2003, a majority of the Court agreed that "[t]hrough th[e] thicket of Eighth Amendment jurisprudence, one governing legal principle emerges as `clearly established'" that a "gross disproportionality principle is applicable to sentences for terms of years." Lockyer v. Andrade, 538 U.S. 63, 72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).
As a review of the Supreme Court cases on Eighth Amendment questions reveals, successful proportionality challenges in noncapital cases have been exceedingly rare. In Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), the Court held that a sentence of life imprisonment with the possibility of parole for a three-time offender did not violate the Eighth Amendment even though the triggering offense was a conviction for felony theft by obtaining $120.75 by false pretenses. Two years later, in Hutto v. Davis, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982), the Court held that a sentence of two consecutive terms of twenty years' imprisonment for possession with intent to distribute nine ounces of marijuana and distribution of marijuana was constitutional. The first and only case in which the Supreme Court has invalidated a prison sentence because of its length was Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). The defendant in Solem, who had previously been convicted of six nonviolent felonies, was sentenced to life imprisonment without the possibility of parole for writing a "no account" check for $100. Id. at 279-81, 103 S.Ct. 3001. The Court's proportionality analysis was "guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." Id. at 292. The Court concluded that the sentence of life imprisonment without the possibility of parole was "the penultimate sentence for relatively minor criminal conduct" and was "significantly disproportionate" to the crime. Id. at 303.
Since Solem, the Court has heard only two cases in which a sentence has been challenged on proportionality grounds. The Court upheld both sentences, without agreeing on a rationale. In Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the defendant was convicted of possessing 672 grams of cocaine and sentenced to a mandatory term of life in prison without parole. A majority of the court concluded that the sentence imposed did not violate the Eighth Amendment. Id. at 994-96, 1009, 111 S.Ct. 2680. Justice Scalia, joined by Chief Justice Rehnquist, opined that proportionality review should apply only in death penalty cases. Id. at 994, 111 S.Ct. 2680. Justice *923 Kennedy, joined by Justices O'Connor and Souter, interpreted the Eighth Amendment as forbidding only extreme sentences that are "`grossly disproportionate'" to the crime. Id. at 1001, 111 S.Ct. 2680 (quoting Solem, 463 U.S. at 288, 103 S.Ct. 3001). Looking at the three criteria used in Solem, Justice Kennedy concluded that the second and third factors, which involve an intrajurisdictional and interjurisdictional comparison, should be used only in the rare instance in which an inference of gross proportionality exists based on the gravity of the offense and the harshness of the sentence. Id. at 1005, 111 S.Ct. 2680. The four-member dissent criticized Justice Kennedy for abandoning the second and third factors because it "makes any attempt at an objective proportionality analysis futile." Id. at 1020, 111 S.Ct. 2680.
Twelve years after Harmelin, the Supreme Court could still not reach a rationale for an Eighth Amendment analysis that would command a majority in Ewing, 538 U.S. at 11, 123 S.Ct. 1179. The defendant in Ewing was convicted of felony grand theft for shoplifting three golf clubs, each valued at $399. Id. at 18, 123 S.Ct. 1179. Because of his prior convictions, the defendant was sentenced to prison for twenty-five years to life under California's "Three Strikes and You're Out" law. Id. at 20, 123 S.Ct. 1179. Writing for a plurality of three, Justice O'Connor applied Justice Kennedy's analysis in Harmelin and concluded that the sentence was not grossly disproportionate to the crime. Id. at 23-30, 123 S.Ct. 1179. Justices Scalia and Thomas concurred in the judgment but argued that prison sentences should not be subject to a proportionality analysis. Id. at 31-32, 123 S.Ct. 1179. The dissenters argued that Ewing was one of the rare cases in which a court can say that the "punishment is `grossly disproportionate' to the crime." Id. at 37, 123 S.Ct. 1179.
The Florida Supreme Court has interpreted the decisions in Solem, Harmelin, and Ewing as requiring that at a minimum a prison sentence must be grossly disproportionate to the crime to constitute cruel and unusual punishment solely because of its length. Adaway v. State, 902 So.2d 746, 750 (Fla.2005). This conclusion is directly supported by the majority opinion in Lockyer, 538 U.S. at 72, 123 S.Ct. 1166, in which the Court stated that the one principle clearly established in its case law was that a gross proportionality analysis is applicable to sentences for terms of years. Based on these principles, Mr. Paey must demonstrate that his sentences are grossly disproportionate to his convictions for his sentences to constitute cruel and unusual punishments that violate the Eighth Amendment.
B. Mr. Paey's Case
We conclude that Mr. Paey's mandatory minimum sentences of twenty-five years' imprisonment are not grossly disproportionate to his crime of trafficking in oxycodone. As a reviewing court, we are required to grant substantial deference to the broad authority that the Florida Legislature possesses in determining the types and limits of punishments for crimes. See Solem, 463 U.S. at 290, 103 S.Ct. 3001. Beginning in Rummel, the Supreme Court has stressed the important role that a legislature plays in the criminal justice system by noting that for crimes punishable by terms of imprisonment, "the length of the sentence actually imposed is purely a matter of legislative prerogative." 445 U.S. at 274, 100 S.Ct. 1133. Justice Scalia's discussion in Harmelin of why a legislature is in the best position to assess the gravity of a crime is particularly pertinent to Mr. Paey's case:
But surely whether it is a "grave" offense merely to possess a significant quantity of drugsthereby facilitating *924 distribution, subjecting the holder to the temptation of distribution, and raising the possibility of theft by others who might distributedepends entirely upon how odious and socially threatening one believes drug use to be. Would it be "grossly excessive" to provide life imprisonment for "mere possession" of a certain quantity of heavy weaponry? If not, then the only issue is whether the possible dissemination of drugs can be as "grave" as the possible dissemination of heavy weapons. Who are we to say no? The members of the [] Legislature, and not we, know the situation on the streets. . . .
501 U.S. at 988, 111 S.Ct. 2680.
The Florida statutes addressing the subject demonstrate that the legislature considers oxycodone to be a potentially dangerous substance. Section 893.03 contains standards and schedules for controlled substances. Oxycodone, a derivative of opium, is listed as a Schedule II substance. § 893.03(2)(a)(1)(o). "A substance in Schedule II has a high potential for abuse" and "abuse of the substance may lead to severe psychological or physical dependence." § 893.03(2)(a). Because of oxycodone's high potential for abuse and the effects of such abuse, the Florida Legislature could rationally conclude that the threat posed to the individual and to society by possession of at least twenty-eight grams of oxycodone is sufficient to warrant the deterrent and retributive effect of a twenty-five-year mandatory minimum sentence.
To support the argument that his twenty-five-year mandatory minimum sentences are cruel and unusual punishments, Mr. Paey points to the fact that he had no prior criminal history and that his crime was not a violent crime. However, it is not unconstitutional to impose a mandatory term of imprisonment without regard to the absence of prior convictions. See Harmelin, 501 U.S. at 994-95, 111 S.Ct. 2680. Additionally, the lack of violent behavior does not always determine the strength of society's interest in deterring a particular crime. See Rummel, 445 U.S. at 275, 100 S.Ct. 1133. The Supreme Court has declared that the "[p]ossession, use, and distribution of illegal drugs represent `one of the greatest problems affecting the health and welfare of our population.'" Harmelin, 501 U.S. at 1002, 111 S.Ct. 2680 (Kennedy, J., concurring) (quoting Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 668, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)). Thus the Florida Legislature could reasonably decide that trafficking in oxycodone is serious enough to warrant a significant term of imprisonment even in the absence of a prior offense or violent behavior. Consequently, the circumstances that Mr. Paey relies upon to argue that his sentences are unconstitutional do not persuade us to engage in "the basic line-drawing process that is `properly within the province of legislatures, not courts.'" Hutto, 454 U.S. at 374, 102 S.Ct. 703 (quoting Rummel, 445 U.S. at 275-76, 100 S.Ct. 1133).
At oral argument, the State directed our attention to Henderson v. Norris, 258 F.3d 706 (8th Cir.2001), in which the Eighth Circuit held that a life sentence for the delivery of .238 grams of cocaine base violated the Eighth Amendment.[2] We conclude that the facts in Henderson are distinguishable from the facts in Mr. Paey's case. As described by the Eighth Circuit, the amount of drugs that Henderson sold was "extraordinarily *925 small," weighing "less than one-quarter of a gram." Id. at 710. Here, the amount of oxycodone which Mr. Paey possessed that was sufficient to qualify him for each of his seven trafficking convictions was not extraordinarily small. Florida's statutory scheme fixes the severity of the punishment for trafficking offenses to three categories determined by the weight of the illegal substance involved. Under section 893.135(1)(c)(1), the three weight categories are: (1) four to fourteen grams, (2) fourteen to twenty-eight grams, and (3) twenty-eight grams to thirty kilograms. See § 893.135(1)(c)(1)(a)-(c). Mr. Paey's convictions for trafficking were based on his possession of thirty-three grams of oxycodone for each illegal prescription that he had filled.[3] Because the amount of oxycodone that Mr. Paey possessed fell into the highest weight category under subsection (1)(c)(1), we cannot conclude that Mr. Paey possessed such an extraordinarily small amount of oxycodone that his crime should not be considered severe.
Mr. Paey's case is also distinguishable from Henderson based on the type of sentence imposed. Henderson was sentenced to life imprisonment. 258 F.3d at 707. According to the Eighth Circuit, the life sentence meted out to Henderson was the harshest sentence that could then be imposed in Arkansas, other than a death sentence for the crimes of capital murder and treason. Id. at 711. In Arkansas, an offender sentenced to life imprisonment was not eligible for parole unless the governor commuted the sentence to a term of years in the exercise of clemency. Id. The Eighth Circuit used this fact to liken Henderson's case to Solem, the only Supreme Court case declaring a term of imprisonment unconstitutional. Id. at 711-12. In Solem, the Supreme Court discussed the difference between the normal expectation of parole eligibility and the bare possibility of commutation. 463 U.S. at 300-03, 103 S.Ct. 3001. The Court relied on this difference to distinguish the life sentence without possibility of parole imposed in Solem from the life sentence with possibility of parole upheld in Rummel and to hold that the life sentence without possibility of parole was disproportionate. Id. at 303, 100 S.Ct. 1133. Based on the analysis in Solem, the Henderson court concluded that Henderson's life imprisonment sentence was grossly disproportionate to the crime he committed. 258 F.3d at 711-12.
Mr. Paey's case is distinguishable from Henderson's because Mr. Paey did not receive a life sentence. Mr. Paey's twenty-five-year mandatory minimum sentences are considerably less severe than a life sentence with the possibility of parole and are substantially less severe than a life sentence without the possibility of parole, which appears to have been imposed in Henderson. Because of the substantial difference in the facts of the two cases, we find Henderson to be unpersuasive on the Eighth Amendment issue in Mr. Paey's case.
The twenty-five-year mandatory minimum prison sentence the Florida Legislature prescribed in section 893.135(1)(c)(1)(c) for trafficking in twenty-eight or more grams of oxycodone falls within the outer limits of a rational weighing of the alternatives concerning an appropriate prison term for this offense. This is not one of those rare cases in which the sentence imposed is so grossly disproportionate in comparison to the crime committed that it is cruel and unusual. For *926 this reason, we hold that Mr. Paey's sentences for trafficking in oxycodone do not violate the Eighth Amendment's prohibition against cruel and unusual punishments.

III. FLORIDA CONSTITUTIONAL ANALYSIS
We turn now to consider whether Mr. Paey's sentences violate the former version of article I, section 17 of the Florida Constitution. This provision provided: "Excessive fines, cruel or unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden." Art. 1, § 17, Fla. Const. (1997). Because the Florida Constitution prohibited "cruel or unusual" punishments, some have argued that it provided greater protection than the protection provided in the "cruel and unusual" punishments clause of the Eighth Amendment to the United States Constitution. See Hale v. State, 630 So.2d 521, 525 (Fla.1993). However, the Florida Supreme Court has never concluded "that the difference between the federal `and' and the Florida `or' was constitutionally decisive." Adaway, 902 So.2d at 752. Consequently, our supreme court has never outlined the parameters of Florida's former cruel or unusual punishment clause. Id.; see also Hale, 630 So.2d at 526 (declining "to delineate the precise contours of the Florida guarantee against cruel or unusual punishment").
The Florida Supreme Court considered whether the mandatory minimum sentences of section 893.135(1), Florida Statutes (1979), violated the Florida Constitution in State v. Benitez, 395 So.2d 514 (Fla.1981).[4] In Benitez, the court noted that it had consistently upheld minimum mandatory sentences, regardless of their severity, against constitutional attacks. Id. at 518; see also Hall, 823 So.2d at 761. Like the United States Supreme Court, the Florida Supreme Court affirmed its commitment to the principle that the legislature, and not the judiciary, determines maximum and minimum penalties for violations of the law. Benitez, 395 So.2d at 518; see also Hale, 630 So.2d at 526. While admitting that the penalties imposed in section 893.135 are severe, the Benitez court concluded that they are not cruel or unusual[5] in light of "their potential deterrent value and the seriousness of the crime involved." 395 So.2d at 518.
Mr. Paey makes the argument that his sentence is unconstitutional because the *927 weight of the actual amount of oxycodone that he possessed was, in each instance, substantially less than twenty-eight grams. As we explained previously, Mr. Paey was convicted on seven counts of trafficking based on his possession of 33 grams of oxycodone for each illegal prescription that he had filled. At trial, the pharmacist witnesses testified that each oxycodone pill is comprised of 5 milligrams of oxycodone and 325 milligrams of acetaminophen, totaling 330 milligrams per pill. Because each prescription was for 100 pills, the total weight of each prescription was 33,000 milligrams or 33 grams. Although the substantial majority by weight of each prescription was composed of acetaminophen, under section 893.135(1)(c)(1) an individual can be found guilty of trafficking in oxycodone for possessing "any mixture" containing oxycodone that weighs at least four grams. The statute's language prompted the Florida Supreme Court to conclude that the total weight of an oxycodone tablet should be multiplied by the number of tablets in the possession of the accused to determine whether the weight of the substance meets the threshold for trafficking purposes. State v. Travis, 808 So.2d 194 (Fla.2002) (approving Eagle v. State, 772 So.2d 1 (Fla. 2d DCA 2000)). The State's calculation of the aggregate amount of oxycodone that Mr. Paey possessed was consistent with Travis. Thus Mr. Paey's argument on this point is without merit.
Based on our supreme court's holding in Benitez and the seriousness of Mr. Paey's trafficking offenses, we conclude that the sentences imposed on him do not violate the former version of article I, section 17 of the Florida Constitution.

IV. CONCLUSION
Because of the unusual circumstances present in this case, reasonable people might come to different conclusions about the wisdom of the twenty-five-year mandatory minimum sentences that the trial court was required to impose on Mr. Paey. Although Mr. Paey is responsible for his actions, his history of chronic pain and consequent need for analgesics has resulted from circumstances largely beyond his control. These factorscombined with Mr. Paey's age and other persistent health problemsnaturally evoke sympathy for what he has endured and concern for his future welfare.[6] Nevertheless, this court's function is limited to determining whether the trial court committed legal error in connection with Mr. Paey's trial and sentencing. In our system of government, which is characterized by a separation of powers, the power to grant pardons and to commute sentences is the prerogative of the executive branch, not the judiciary. See ch. 940, Fla. Stat. (2005). Thus Mr. Paey's argument about his sentences does not fall on deaf ears, but it falls on the wrong ears.
For the reasons already stated, we conclude that the trial court did not commit any reversible error, and we affirm Mr. Paey's judgments and sentences.
Affirmed.
SALCINES, J., Concurs.
SEALS, JAMES H., Associate Judge, Dissents with opinion.
SEALS, JAMES H., Associate Judge, Dissenting.
I respectfully but vigorously dissent from this court's ruling that the mandatory *928 sentence imposed in this case does not violate the Eighth Amendment to the United States Constitution and article I, section 17, of the Florida Constitution.
Benjamin Cardozo once said that a principle has a tendency "to expand itself to the limit of its logic."[7] This case illustrates a principle expanded to and beyond that limit. That principle is the legislature's prerogative to enact laws making certain crimes punishable by minimum mandatory sentences. I question neither the wisdom nor the merit of the principle here. It is the executive branch's expansion of that principle in this case beyond the limit of its logic that compels me to dissent.
Certain criminal conduct, or the repetition thereof, has been determined to be so egregious or so threatening to public health, safety, and welfare that our legislature determined that certain crimes or certain types of criminal offenders should forfeit their eligibility for any consideration of discretionary leniency by the courts. Instead these offenders would be incarcerated to serve every day of a definite and lengthy prison sentence. These "mandatory minimums" are designed to grant assurance that offenders will receive stern punishment, that they will not be at liberty to reoffend for a substantial period of time, and that they and others will not commit these crimes now or in the future.[8] Florida's anti-drug trafficking statute, section 893.135(1), Florida Statutes (Supp.1996), carries mandatory minimum sentences.
Trafficking in controlled substances is an evil enterprise. The person[9] or organization[10] engaged in trafficking exploits sick and vulnerable people for personal gain and profit, knowing that his product will ruin, or perhaps even take, countless lives, destroy families, and cause billions of dollars in lost productivity and increased health care and social services costs. Logically, the Florida Legislature enacted tough legislation to counteract this odious, parasitic activity.[11]
As long as the conduct sought to be punished, banished, and deterred by mandatory sentences is clearly defined and truly circumscribes only the intended evil and wicked acts, the principle works comfortably within the limits of its logic. But when the language is broad or vague, the law leaves room within that circumscription to include conduct manifestly not deserving of minimum mandatory prison sentences. The principle now has the capacity to expand itself to and beyond its logical limits.
The language of Florida's anti-drug trafficking statute is broad. It creates an expansive net designed to capture offenders even before the product gets to the *929 streets. The upside of this broadly written statute is an anti-drug trafficking law that affords law enforcement optimal opportunity and capability for early interdictionanother logical public safety principle.[12] The downside is the potential for law enforcement and prosecutors to expand the crime far beyond the limits of its logic and to use it irresponsibly, foolishly, recklessly, or even vindictively. The result might well be convictions and sentences that go beyond the bounds of decency, probity, and fair playperhaps even into the realm of cruel and unusual.
This is especially true when the statute describes trafficking by the mere knowing possession of controlled substances that exceed certain weights. Not only does the statute make knowing possession without anything else a severely punishable act, it creates a conclusive, irrefutable presumption that the mere possession itself constitutes the odious crime of drug trafficking and all that the term implies. Unless the possessor falls within the obvious exceptions (e.g., pharmacies, hospitals, doctor's offices),[13] the prosecution can make an open and shut case for trafficking by merely proving what the substance is, its weight, the identity of the possessor, and the possessor's actual knowledge of what it was he or she possessed. Possession, therefore, is not a piece of circumstantial evidence giving rise to a presumption of trafficking. Possession is trafficking. No proof of an act in furtherance of a criminal purpose is required. Intent is immaterial. The mental or physical state of the person in possession is a fact the prosecutor is free to ignore.
Here are four scenarios that create a prima facie case for trafficking under Florida's anti-drug trafficking law:
1. The conscientious but forgetful high school principal. A high school principal discovers on school grounds a cache of thirty packets of what he knows from experience to be cocaine, each packet containing one gram of cocaine. He takes possession of it, locks it in his desk until he can turn it over to the police, and informs his secretary of his intentions. An emergency calls him away and he forgets to call the police. Sixty days later his secretary discovers the cocaine is still there and *930 reports it to a school resource officer.[14]
2. The concerned wife. Suppose Mrs. Paey, the defendant's wife, is worried that her husband is over-consuming oxycodone. She hides the 700 oxycodone pills from him so that she can regulate his intake.[15]
3. The inadvertently addicted doctor. A doctor inadvertently becomes addicted to the painkillers he took following a skiing accident. He removes from the narcotics cabinet in his office twenty sample packets of oxycodone, each containing six pills (aggregate weight: thirty-six grams), which were given to him by a drug company representative for distribution to patients. He takes them home for his personal use.[16]
4. The medical marijuana widows. Five elderly widows in a retirement condominium share a stash of twenty-five pounds of marijuana kept in a property locker on site. Two of them smoke it for relief from nausea caused by chemotherapy. Two more use it to treat glaucoma. The fifth widow smokes it because she finds it gives her relief from her severe arthritis pain.[17]
Can anyone imagine the school principal being labeled a drug dealer or Mrs. Paey a dope pusher or the doctor a narcotics racketeer; or the five widows a drug cartel? Before this case, that would have been considered illogical and absurd. But now?
Trafficking is a term of commerce,[18] not consumption.[19] A law regulating controlled substances which carries a "trafficking" label implies an attack on illegal commerce in drugs, not the consumption by the end user.[20] The State, by what it did not prove and could not prove, all but conceded that Mr. Paey was not moving the product through underground channels of distribution to end users but, instead, that he was the end user.[21]
*931 The case here, plainly and simply, is about obtaining controlled substances by forgery and fraud.[22] Nevertheless, the State Attorney's Office of the Sixth Judicial Circuit elected to stretch Florida's highly elastic anti-drug trafficking statute and elevated a third-degree felony, punishable by no more than five years of incarceration or probation, or some combination of the two, into a first-degree felony punishable by a minimum mandatory prison term of twenty-five years. Although this was Mr. Paey's first conviction of any kind, the prosecution sought to have the court impose one of the heaviest nondeath penalties under state law instead of a penalty which could have (and should have) focused on supervision and treatment.
In the investigative stage, law enforcement discovered that Mr. Paey was purchasing large amounts of oxycodone, hydrocodone, and diazepam from local pharmacies. A search warrant was obtained and executed. The search did not turn up evidence commonly sought or frequently found in search warrants for the illegal manufacture, sale, or distribution of drugs. Not found were devices for weighing, cutting, crushing, mixing, reconstituting, and repackaging drugs. No additional aggregate for diluting drug compounds were found. No records, weapons, or suspicious amounts of cash were seized. The drugs were in the same condition as when they were dispensed at the pharmacy. The only drugs seized were the same ones that had once been lawfully prescribed for him for treatment of his back pain. Moreover, the investigation turned up no evidence of suspicious bank accounts, money laundering, unusually expensive luxury items, or a lifestyle incompatible with lawful family income. Nonetheless, based on the evidence that Mr. Paey, by nefarious means, acquired and knowingly had in his possession a qualifying amount of the same medication he had been taking for the past twelve years or so, he was charged with trafficking. With no competent proof that he intended to do anything other than put the drugs into his own body for relief from his persistent and excruciating pain, the State chose to prosecute him and treat him as a trafficker in illegal drugs. Instead of recognizing the real problem and the real behaviors that led to his real crimes and holding him appropriately accountable, the State decided to bring out the artillery designed to bring down the drug cartels.
The State's trial strategy was to concentrate solely on the possession element of drug trafficking. Its opening statement and closing argument concentrated solely on proving possession. No effort was made to prove by circumstantial evidence that Mr. Paey was either placing, attempting to place, or intending to place any of these pills into the underground stream of commerce. If the law had required the State to raise a reasonable hypothesis consistent with what the term trafficking connotes and implies, it could not have done so. The only reasonable hypothesis to be drawn from Mr. Paey's possession of controlled substances were medical need (offered by the defense) and addiction (suggested by the prosecution). By avoiding efforts to prove Mr. Paey was actually involved in the manufacture, sale, or distribution of drugsor that he was actually *932 attempting or even intending to do same one must conclude that the State had no proof. Nevertheless, the jury, not knowing what the penalties for the various charges would be,[23] was able to find that the State met its burden of proof on all the elements of the crime of trafficking by possession.
Once convicted and sentenced, Mr. Paey had only two courses of action to obtain relief from the mandatory sentence. One of them is a judicial nullification of the sentence through the ban against cruel and unusual punishment, or cruel or unusual punishment, as found in the Eighth Amendment to the United States Constitution and article I, section 17 of the Florida Constitution, respectively.[24] The other is executive clemency.
As Judge Wallace points out in his excellent analysis of the law of cruel and unusual punishment in cases not involving the death penalty, the standard is gross disproportionality, and it has been set so high that it has rarely been exceeded. While I agree with the majority's analysis of the cases, I disagree with the application of the law to this case and the conclusions they reached for the following three reasons:
1. Mr. Paey's personal responsibility and moral guilt was not taken into account. Instead, collateral, aggravating acts were wrongly imputed to him by conjecture, not proof.
2. Florida's cruel "or" unusual punishment provision is not arguably broader than the federal cruel "and" unusual punishment provision. It is broader. For Florida's courts to hold otherwise is committing textual violence on four very common words in the English language and the two phrases they form.
3. A particular prosecution for a crime that makes a legislative act appear absurd, unjust, and illogical, and the absurdity, injustice, and illogic is further compounded by a legislatively mandated penalty that far exceeds a defendant's personal responsibility and moral guilt, is cruel or unusual or both.

I. MORAL GUILT and COLLATERAL ACTS
This appeal is not about whether first-degree trafficking merits a twenty-five-year minimum mandatory sentence. When applied within the limits of its logic to those acts generally connoted and implied by the term "trafficking," it is clearly a proportionate sentence. Our scope of review is not about whether there was competent, substantial evidence to reach the trafficking threshold as it is literally defined. We are here to determine whether this defendant's act measures up to the prescribed penalty without violating the Eighth Amendment or article I, section 17.
The courts in the cases discussed in the majority opinion not only examined the general nature and seriousness of the crime charged, but they also wrestled with the unique facts and circumstances of each case, especially those cases in which harsh sentences were imposed against repeat offenders for relatively minor crimes. See, *933 e.g., Ewing v. California, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (shoplifting golf clubs); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (writing a "no account" check for $100); Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (thieving of $120.75 by false pretenses). It is also significant to note that all of these cases were decided by a plurality of justices.
Here, the majority concentrated on how bad trafficking is and how dangerous oxycodone can be, as though the crime of trafficking is only one color of paint. It is not. As has already been established, the definitions of trafficking make crimes out of a rainbow of conduct ranging from innocent (e.g., the high school principal) to desperate (e.g., the concerned wife and the marijuana widows) to foolish (e.g., the addicted doctor) to evil.
The majority looks at Mr. Paey and wonders what he might have done or what might have happened with all of those drugs in his possession, citing with approval to Justice Scalia's discussion in Harmelin, 501 U.S. at 988, 111 S.Ct. 2680, concerning what could go wrong when someone merely possesses certain large quantities of drugs.[25] They did not view Mr. Paey as a man who stands innocent of manufacturing the drugs, distributing the drugs, selling the drugs, or attempting or intending to manufacture, distribute, or sell the drugs.
In People v. Bullock, 440 Mich. 15, 485 N.W.2d 866 (1992), the Michigan Supreme Court heard a case which considered the very same issue as Harmelin. In Bullock the Michigan Supreme Court reviewed a life without parole sentence for possession of 650 grams or more of cocaine under the state's constitutional ban on cruel or unusual punishment.[26] On the issue of collateral effects flowing from the mere possession of cocaine, the Michigan court wrote:
To be sure, it may be argued that possession of such a large quantity of drugs is a fact from which, depending on the context, a jury might properly infer an intent to sell or distribute. We agree, and it is entirely possible that the evidence in this case would have been sufficient to support convicting both defendants of possession with intent to sell or deliver. But no jury drew, or was asked to draw, such an inference with regard to these defendants. By choosing to prosecute these defendants solely for possession, the people avoided the need to meet the heavy burden of proof beyond a reasonable doubt that these defendants intended to sell or distribute. Therefore, they must be deemed innocent of any such intent for purposes of analyzing the facial proportionality of *934 the disputed penalty to the offense for which it is imposed. It would be inconsistent with the most basic norms of our system of justice to treat these defendants, for present purposes, as guilty of a crime of which they were never convicted, and for which the people never even sought to prosecute them.
485 N.W.2d at 876 n. 19.
The court went on to say:
But conviction of the crime involved here does not require any proof the defendant committed, aided, intended, or even contemplated any loss of life or other violent crime, or any crime against property. As Justice White correctly noted in Harmelin, "[t]o be constitutionally proportionate, punishment must be tailored to a defendant's personal responsibility and moral guilt." . . . While we emphatically do not minimize the gravity and reprehensibility of defendant's crime, it would be profoundly unfair to impute full personal responsibility and moral guilt to defendants for any and all collateral acts, unintended by them, which might have later been committed by others in connection with the seized cocaine. Persons who independently commit violent crimes in connection with illegal drugs can and should be held individually responsible by our criminal justice system.
Id. at 876.
Instead of considering Mr. Paey's personal responsibility and moral guilt, the majority clings to the old aphorisms about legislative wisdom and will. Generally speaking they are correct. The legislature is indeed more able to assess the gravity of criminal conduct and the people's will for a proportionate response. That is not to say the legislature is omniscient and its laws perfect. No legislative body can know all the permutations of all the facts that could conceivably lead to a conviction under a law it wrote, particularly a broadly written one, and then believe that a single, inflexible punishment will always justly and fairly fit in all cases. Did our legislature, for example, have in its collective mind the four previously mentioned scenarios when it passed section 893.135? Did its institutional prescience evoke the image of the high school principal, the concerned wife, the addicted doctor, and the ailing widows all sitting in a Florida prison for three years or twenty-five years, and upon seeing it say that it is right and good that they be there?
It is precisely for the reason that the legislature is not omniscient that it must rely upon the executive branch to exercise logic, sober consideration, discretion, discernment, wisdom, fairness, restraint, and yes, sometimes even mercy[27] when applying the imperfect laws. In Warner v. City of Boca Raton, 887 So.2d 1023, 1033 n. 9 (Fla.2004), the court noted: "This Court has stated that a statutory provision should not be construed in such a way that it renders the statute meaningless or leads to absurd results. See Palm Beach County Canvassing Bd. v. Harris, 772 So.2d 1273 (Fla.2000)." (Emphasis added.)[28]
Our legislature is a citizen legislature whose members have to spend part of their public service careers earning a living by some other means. They work *935 hard and they have a lot of work to accomplish within a short time. From time to time they will inadvertently give a howitzer to the executive branch with apparent authority to use it on a squirrel. That does not mean they want the executive branch to use it in that manner. When that does happen and the result is someone receives a penalty that is grossly disproportionate to the defendant's moral guilt, it is the duty of the courts of this state to step in and apply the check granted by the Eighth Amendment or article I, section 17.

II. "AND" and "OR"
The majority seems to say that Adaway, 902 So.2d 746, draws no distinction between the federal "and" and the Florida "or" when considering proportionality of sentences to terms of years. At the beginning of Adaway, in a footnote, the court mentions that the Florida Constitution's ban on cruel or unusual punishments is arguably broader than the United States Constitution's ban on cruel and unusual punishments. Later, the court announces it has never concluded that "the federal `and' and the Florida `or' was constitutionally decisive." Id. at 752.
In Logic 101 we were introduced to the two interlocking circles. The area where the two circles overlap describes the area representing the conjunctive "and." The area of the two circles combinedincluding the overlapping and non-overlapping area . . . represents the disjunctive "or." Unless the nouns or adjectives representing each circle are identical, the "or" area is always larger, i.e., broader, than the "and" area. The adjectives "cruel" and "unusual" are not identical and interchangeable.[29] Moreover, they are not even synonymous.[30] Therefore, the rules of logic and English grammar hold that the term "cruel or unusual" covers a broader conceptual area than "cruel and unusual." Furthermore, because cruel and unusual are not commonly viewed as synonymous with one another, it can fairly be said from a textual point of view that the disjunctive "or" substantially enlarges the territory over the conjunctive "and."
The Michigan Supreme Court in Bullock, 485 N.W.2d at 872, believed that to be true. It held that there was a textual difference between "cruel and unusual" and "cruel or unusual" when it decided it was not bound by the Supreme Court's holding in Harmelin, a case arising out of the same state involving the same crime.[31] Moreover, the Florida Supreme Court has held that when interpreting its own constitution, it is not bound by the Supreme Court's interpretation of a parallel provision in the Federal Constitution. Pomponio v. Claridge of Pompano Condo. Inc., 378 So.2d 774 (Fla.1979).
Adaway, notwithstanding the fact that the Florida Supreme Court has never found the federal "and" and the Florida "or" to be "constitutionally decisive," does not imply, as the majority seems to believe, that it is predisposed to believe that the two phrases are interchangeable. What I believe the Florida Supreme Court is saying is that a case has never come *936 along which required the court to consider the differences between the two constitutional phrases. Adaway, 902 So.2d 746; Benitez, 395 So.2d 514; and Hale v. State, 630 So.2d 521 (Fla.1993), did not discuss the differences between the two because they did not have to. In each case, the court ruled that the sentences were so proportionate that it did not matter which constitutional provision was applied. Moreover, all three cases are significantly different on their facts from this case.[32]
Whether the metaphor is legislative "base-lines" or judicial "contours," the simple fact of the matter is that this case deserves a fresh scrutiny under both the Federal Constitution's cruel and unusual standard and the Florida Constitution's cruel or unusual standard, two standards that do not necessarily have to be the same or, for that matter, should not be the same. There is no line of cases out there that is so authoritative or so close on the facts to this one that the result reached in those cases should dictate the outcome of this case.[33]

III. CRIME and PUNISHMENT

I will not reiterate the analysis previously given to support my conclusion that the sentence in this case for a lone actthe mere possession of unlawfully obtained medicine for personal useis illogical, absurd, unjust, and unconstitutional under both the Eighth Amendment and article I, section 17. True, this is not a life-without-parole case, but the small number of cases which form the ambiguous and amorphous body of law regulating proportionality of nondeath penalties does not rule out lesser sentences. There is no bright line drawn at the life-without-parole-level. It leaves room for case-by-case consideration and comparison of each defendant's personal responsibility and moral guilt, and the severity of the sentence imposed. If the sentence is not both cruel and unusual, it is at the very least cruel or unusual.
I suggest that it is cruel for a man with an undisputed medical need for a substantial amount of daily medication management to go to prison for twenty-five years for using self-help means to obtain and amply supply himself with the medicine he needed. I suggest it is cruel for government to treat a man whose motivation to offend sprang from urgent medical problems the same as it would treat a drug smuggler motivated to obtain personal wealth and power at the expense of the misery his enterprise brings to others. I suggest that it is unusual, illogical, and unjust that Mr. Paey could conceivably go to prison for a longer stretch for peacefully but unlawfully purchasing 100 oxycodone pills from a pharmacist than had he robbed the pharmacist at knife point, stolen fifty oxycodone pills which he intended to sell to children waiting outside, and then stabbed the pharmacist. I suggest that it is unusual, illogical, and absurd for the prosecution, *937 an agent of the executive branch, to abuse and misuse section 893.135 in the belief that it is doing the will of the legislature and of the people of this state. It is illogical, absurd, cruel, and unusual for the government to put Mr. Paey in prison for twenty-five years for foolishly and desperately pursuing his self-help solution to his medical management problems, and then go to prison only to find that the prison medical staff is prescribing the same or similar medication he had sought on the outside but could not legitimately obtain. That fact alone clearly proves what his intent for purchasing the drugs was. What a tragic irony.
When a sly and cunning attorney uses the unintended literal letter of the law to evade the just and transcending spirit and purposes of the law, we disapprovingly say the attorney has found a "loophole" in the law. We say the litigant has deliberately chosen to resort to the means of a hyper-rigid application of a law or rulea "technicality," if you willto achieve self-serving ends reasonable people would characterize as a miscarriage of justice. The State, and ultimately the people of Florida, is the frequent victim of loopholes and legal technicalities, and we are outraged because justice is mocked and the law is made to look like an ass. Should the public think any differently when its own government and its own attorneys turn the table and evade a rule of law to the prejudice and detriment of one of its own constituents? Should not government be above that sort of thing?
Since we uphold the verdict of guilt in this case one might ask what rule or law did the State evade? It is a rule not found in a statute book or in the rules of procedure; yet, it is written all over both. It is the rule of fairness,[34] probity, and equity. It is the rule of reason, sound discretion, and common sense. It is the rule of measure for measure, more commonly known as "an eye for an eye, a tooth for a tooth."[35] It is the rule of restoring balance and equilibrium between people and other people, their communities, governments, and institutions. It is, simply, the rule we learned as children that you do unto others as you would have them do unto you.[36] It is the natural, moral law of the universe that has informed man-made law since at least as early as the time of Moses.[37] It is the same universal, moral law that informed thirteen colonies seeking separation from the tyrannical rule of King George III around 230 years ago.[38]
The American criminal justice system is the envy of and the model for the world. How then can our great system not consider it "unusual" for a prosecuting authority to illogically interpret a statute that leads to an absurd result and get away with it? How is it not "cruel" to circumvent judicial *938 checks and balances and intentionally put a man in prison for 9125 days when his offense was being foolish and desperate in how he went about obtaining his medicine?[39]
Dr. Martin Luther King, Jr., once said, "It may be true that the law cannot make a man love me, but it can stop him from lynching me, and I think that's pretty important."[40] Although Mr. Paey is not being unlawfully put to death, the saying captures a crucial principle of American justice that has application to this case: that the law is just as much a shield against injustice as it is a weapon for justice. We expect the law to protect life, liberty, and property so much so that the people gave the courts laws that shield against injustice and it gave judges the independence to use it without fear of retribution from the king. Two of those shields are the Eighth Amendment and article I, section 17. But instead of using them, this court merely expresses sympathy, proclaims them to be the wrong shields, and suggests that executive clemency is the proper shield.
I would find that the judicial shields are the correct shields, and I would use them to quash the mandatory sentence as both cruel and unusual, and cruel or unusual, and I would remand for resentencing based strictly on Mr. Paey's scoresheet.
NOTES
[1] The statute provides, in pertinent part: "Any person who knowingly sells, purchases, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of, 4 grams or more of any morphine, opium, oxycodone, hydrocodone, hydromorphone, or any salt, derivative, isomer, or salt of an isomer thereof, including heroin, as described in s. 893.03(1)(b) or (2)(a), or 4 grams or more of any mixture containing any such substance, but less than 30 kilograms of such substance or mixture, commits a felony of the first degree, which felony shall be known as `trafficking in illegal drugs.'"
[2] We commend John M. Klawikofsky, the assistant attorney general who argued this case for the State, for his professionalism in calling to our attention an authority that could be interpreted as being adverse to the State's position.
[3] As explained below, the weight of oxycodone that Mr. Paey possessed for purposes of determining a punishment under section 893.135(1)(c)(1) is determined by multiplying the total weight of an oxycodone tablet by the number of tablets Mr. Paey possessed.
[4] It is true that when Benitez was decided in 1981, section 893.15(1)(c)(1) did not include oxycodone as a controlled substance for which someone could be convicted of "trafficking in illegal drugs." In 1995, the Florida Legislature added oxycodone to the list of controlled substances in section 893.135(1)(c)(1) in response to several cases in which individuals avoided trafficking convictions for oxycodone under this section. These individuals were able to avoid trafficking convictions under this section because oxycodonea derivative of a controlled substance already listed in the sectionwas not expressly enumerated. Fla. H.R. Comm. on Health Care, HB 1385 (1995) Staff Analysis (May 12, 1995) (available at Fla. Dep't of State, Div. of Library Servs., Tallahassee, Fla.) (amending section 893.135(1)(c)(1)). Because the legislative history suggests that section 893.135 was not originally drafted to exclude oxycodone from the list of controlled substances, we find the principles promulgated in Benitez for the 1979 version of section 893.135 that did not include oxycodone to be equally applicable to the 1996 version of the statute under which Mr. Paey was convicted.
[5] The Benitez court inexplicably used the terminology "cruel and unusual" despite the fact that article I, section 17 of the Florida Constitution used the phrase "cruel or unusual" in 1981. Because there is no dispute that the "cruel or unusual" clause applied in Benitez, we will construe the court's holdings as consistent with the applicable constitutional clause.
[6] At the time of trial in 2004, Mr. Paey also suffered from multiple sclerosis, high blood pressure, high cholesterol, Raynaud's disease, knee problems, depression, arachnoiditis, and lumbar radiculopathy. Although Mr. Paey was generally confined to a wheelchair, he occasionally used crutches or braces. Mr. Paey is currently forty-eight years old. He will be sixty-nine before he will be eligible for release from prison in 2029.
[7] The Nature of the Judicial Process 51 (1921).
[8] Mandatory sentences seek to accomplish three of the four primary goals in sentencing: retribution (punishment), separation (inability to do further harm to free society), and deterrence (crime prevention). The fourth is rehabilitation.
[9] Also known as "pusher," "dealer," "peddler," "smuggler," "racketeer," "wholesaler," or "kingpin."
[10] These organizations are often called "drug cartels" or "drug rings."
[11] The Florida Supreme Court in Benitez, 395 So.2d at 516-17 stated:

Section 893.153 is a unique response to a serious and growing concern of the legislature regarding illegal drug activities in the State of Florida. Subsection (1) of the new law establishes severe mandatory minimum sentences for trafficking in various types of illegal drugs. . . .
. . . No one argues that the elimination of illegal drug traffic is not a beneficial and worthwhile goal, or that the goals of this legislation are not meritorious.
[12] In Benitez, 395 So.2d at 517, the court went on to say:

Section 893.135 was enacted to assist law enforcement authorities in the investigation and prosecution of illegal drug trafficking at all levels of distribution, from the importer-organizer down to the "pusher" on the street. The harsh mandatory penalties of subsection (1), ameliorated by the prospect of leniency in subsection (3), were clearly calculated to provide a strong incentive for drug violators to cooperate with law enforcement authorities and become informers. . . .
Nonetheless, in their zeal to combat the flow and distribution of illegal drugs through this novel legislation, legislators knowingly glossed over alleged constitutional defects in the approach that was being developed. We in the judiciary do not have that luxury.
[13] These exceptions are found in section 893.13. There are no exceptions found in section 893.135, but there is some reference language in section 893.135 which, under rules of statutory construction, permit the two sections to be read together thereby making the exceptions in the former section apply to the latter. An illogical textualist could argue that section 893.135 makes pharmacists and physicians illegal traffickers in drugs, but logical textualism compels us to conclude that it would be absurd for the legislature to exclude these persons and entities from the less severe drug crimes but not the more serious crimes. Yet it is illogical textualism, not logical textualism, that the State relies upon to justify the absurd notion that this is a drug trafficking case.
[14] If convicted, the minimum mandatory sentence under section 893.135(1)(b)(1)(a), trafficking in cocaine, is three years. The principal may offer the defense of temporary control for legal disposition, see Stanton v. State, 746 So.2d 1229 (Fla. 3d DCA 1999), but as we have already found here, that may not prevent an illogical prosecution.
[15] If convicted, the minimum mandatory sentence under section 893.135(1)(c)(1)(c), trafficking in illegal drugs, is twenty-five years.
[16] If convicted, the minimum mandatory sentence is the same as for Mrs. Paey.
[17] If convicted, the minimum mandatory sentence under section 893.135(1)(a)(1), trafficking in cannabis, is three years.
[18] "Trafficking" is a gerund derived from the verb "to traffic." The Random House Dictionary of the English Language, 2006 (2d ed. 1987), defines the verb "traffic" as follows: to carry on traffic, trade, or commercial dealings; to trade or deal in a specific commodity or service, often of an illegal nature. "Traffic," as a noun, is defined as trade; buying and selling; commercial dealings.
[19] A hot dog eating contestant sitting at a plate stacked with fifty hot dogs is not engaged in a commercial enterprise. He is not buying and selling or trading or dealing. He is simply about to consume an abnormally large amount of food.
[20] Trafficking in the criminal commerce sense, I submit, was also not meant to describe innocent or innocuous intermediate possession. For example, the high school principal in the scenario hereinabove was merely acting as an innocent conduit through whom possession was intended to pass from the bad guys to the good guys. The concerned wife was only trying, perhaps unwisely but with good intention, to save her husband from overdosing while at the same supplying him with what he needs for his pain.
[21] Our supreme court, in Benitez, 395 So.2d at 517, spoke of section 893.135 as a means "to assist law enforcement authorities in the investigation and prosecution of illegal drug trafficking at all levels of distribution, from the importer-organizer down to the `pusher' on the street." (Emphasis supplied.) Its discussion of the quarry sought to be captured by this statute ended on the street. It did not go into the home of the consumer.
[22] § 893.13(7)(a)(9), Fla. Stat. (Supp.1996).
[23] Since January 1, 1985, juries are no longer instructed on the penalties a noncapital defendant would receive upon conviction. Fla. R.Crim. P. 3.390(a). This rule forecloses any chance of a jury nullification should they find the penalty to be grossly disproportionate to the actual crime committed.
[24] Mr. Paey was arrested and charged before article I, section 17, was changed to conform to the language in the Eighth Amendment.
[25] Justice Scalia's ruminations in Harmelin were speculative, contrary to Justice White's better-reasoned discussion in his dissent, and frankly a bit over the top. Since when has temptation become the element of a crime? It is acting upon temptation, not having the temptation, which makes the crime. Are we now to be prosecuted for what we think? If a pharmacist is tempted to illegally sell the vast quantities of controlled substances within the easy reach of his hands, does his immunity from the trafficking statute immediately evaporate?

In Krulewitch v. United States, 336 U.S. 440, 457, 69 S.Ct. 716, 93 L.Ed. 790 (1949), Justice Jackson, in a concurring opinion in a case reversing a prosecutorial practice of misapplying the crime of conspiracy, said, "Few instruments of injustice can equal that of implied or presumed or constructive crimes. The most odious of all oppressions are those which mask as justice."
[26] The Michigan Supreme Court held in Bullock that a life without parole sentence for mere possession of 650 grams of cocaine exceeded the cruel or unusual punishment standard. The court ruled that Bullock be granted eligibility for parole.
[27] One of the influential sources of American secular law is the Old Testament. In Malachi 6:8 the prophet exhorts us "[t]o act justly and to love mercy." (NIV, 1973)
[28] In Korash v. Mills, 263 So.2d 579, 582 (Fla.1972), the court said: "Justice may be `blind' but it is not stupid. Impartial fairness and equality is what the blindfold represents." Very recently in Smith v. Krosschell, 937 So.2d 658 (Fla.2006), the court once again reiterated the two aphorisms stated in Korash and Warner.
[29] The Random House Dictionary of the English Language, 483 (2d ed. 1987), defines cruel as "causing or marked by great pain or distress." Unusual is defined as "not usual, common or ordinary." Id. at 2089.
[30] J.I. Rodale's The Synonym Finder (Rodale Press, Inc.1978) does not list either word as a synonym for the other.
[31] Harmelin held that penalty for mere possession of a large amount of cocaine was not cruel and unusual. Bullock, 485 N.W.2d at 875, held that the same penalty for mere possession of a similar amount of cocaine was cruel or unusual.
[32] Adaway was a capital sexual battery case in which actual sexual violence was proven to have been perpetrated on an eleven-year-old child. In Benitez, the appellees were convicted of actually attempting to sell a kilogram of cocaine to undercover agents. In Hale, the appellant was forced to serve a minimum twenty-year sentence before parole eligibility for actually selling cocaine to a confidential informer and being a habitual violent felony offender. In each case, the offender was found guilty of an active offense, not the passive act of possession.
[33] Harmelin is perhaps the most persuasive case for the majority because the defendant was a first-time felony offender who received a life without parole sentence for mere possession. The Michigan Supreme Court in Bullock, 485 N.W.2d at 872, did not feel compelled to follow the result in Harmelin, nor did it agree with the United States Supreme Court, even though both cases arose in Michigan.
[34] The rules of fair play prevail not only through our laws of community life, but also in the rules of our games. We call it "good sportsmanship," and we have referees and umpires who insure that winners win fairly. When players violate rules designed to insure fair play, we expect our referees and umpires to call the foul. If this case were a football game, the State has committed a personal foul for both "piling on" and "unnecessary roughness," but unfortunately the referee will not call it.
[35] Deuteronomy 19:21. This ancient saying is more commonly thought of as a cry for revenge. However, it is a metaphor to explain that the punishment ought to fit the crime.
[36] Matthew 7:12
[37] See, e.g., Deuteronomy 16:18, 19 and Deuteronomy 25:1-3.
[38] The most famous and revered document of our nation, the Declaration of Independence, is a very representative evocation of natural law.
[39] I am aware the State offered a plea that would have removed the mandatory sentence. If incarceration was Mr. Paey's primary concern, then in hindsight it would have been in his best interest to accept the offer. That said, it does not diminish the illogical and irresponsible charging decision initially made. In fact, the State's willingness to offer a much, much lighter sentence when it had an open-and-shut case for trafficking by possession only compounds the absurdity of the decision and further highlights and magnifies the disproportionality between the real crime and the lengthy mandatory sentence. There is no justification for putting nuclear arms on the bartering table when the negotiating is really over clubs and slingshots. It is even worse to use the nuclear arms simply because the other party rebuffs the offer.
[40] The Columbia World of Quotations, No. 32722 (1996).